

**ANDREW M. SANCHEZ**
Ph: 505-259-2069
Fax: 312-565-0000
asanchez@edlawyer.com

June 30, 2025

**VIA ELECTRONIC MAIL ONLY**

**blmoffatt@nmdoj.gov**
Blaine N. Moffatt
Director of Government Counsel & Accountability
Government Counsel & Accountability Bureau
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico  87501-15508

   Re: **Board of Education for the Gallup-McKinley County Schools**
      **IPRA Request for Public Records**

Dear Mr. Moffatt:

  As you are aware, this law firm represents the Board of Education for the Gallup-McKinley County Schools in this matter, and we are responding to your letter dated June 17, 2025.  Concerns were immediately raised when your issues, authorities and arguments match directly with that of the contractor who was subject to the termination of its contract with the School District at the duly called and open meeting of the Board of Education on May 16, 2025.  Although no reference is made directly to any form of a complaint being lodged with your Bureau, the subject line of your e-mail containing your letter is revealing that your letter is in reference to "complaints" received by the Department.

  It appears to us that you are acting pursuant to a complaint or complaints lodged by Stride/K12 Inc., a billion dollar corporation, or its agents, and your letter is premised entirely on its allegations and its subjective interpretation of the facts.  It is clear that your Bureau did not proceed with any form of formal investigation or even with an *ad hoc* process in seeking the School District's side of the story or for any clarification of the facts, issues and authorities being utilized based on the "findings" presented in the initial letter.  Most troubling is the appearance alone of your Bureau coordinating with complainant to presumably undermine fairness and due process. *See Bieber v. Dep't of Army*, 287 F.3d 1358, 1361 (Fed. Cir. 2002) ("The requirements of due process, of course, apply to administrative proceedings[,]" and agency actions), *quoting Utica Packing Co. v. Block,* 781 F.2d 71, 77 (6th Cir. 1986); *see also Pirtle v. Legislative Council Comm. of New Mexico Legislature*, 2021-NMSC-026, ¶ 41, 492 P.3d 586, 599 (N.M. 2021) (agency adjudicative decisions are subject to the notice and hearing requirements of due process).

**EXHIBIT D**

Letter to Blaine N. Moffatt
June 30, 2025
Page 2 of 9



The overriding principles of law that should be governing the actions of the New Mexico Department of Justice here are the standards of due process and fairness. The courts have been clear that "[t]he essential guarantee of the due process clause is that of fairness." *Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 1994-NMSC-096, ¶ 23, 118 N.M. 470, 478, 882 P.2d 511, 519 (N.M. 1994) (*quoting* 2 Donald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 17.8, at 656 (2nd ed. 1992)). The Department's "power to make [and enforce] rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, but also to employ procedures that conform to the law." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (internal citations omitted). "Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals [or entities], it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process [of honoring due process and fairness]." *Amos Treat & Co. v. SEC*, 306 F.2d 260, 263 (D.C. Cir. 1962).

This results in requiring your Bureau to have started with the initial presumption that that the Board of Education acted lawfully and in accordance with the Open Meetings Act, N.M. Stat. Ann. §§ 10-15-1 to -4 (2013) ("OMA") in its May 16th meeting until proven otherwise after affording the School District an opportunity to be heard on the allegations. It has been clearly established in the law for centuries that a party charging another with a culpable decision or breach of duty, the person who claims the damage, is bound to prove it, and there is no presumption that a person has acted illegally until the contrary is proved. *Hicks v. Martin*, 9 Mart.(o.s.) 47, 48 (La. 1820); *see VFS Leasing Co. v. G.F. Kelly, Inc.*, 2007 WL 2069842, at *7 (M.D. Ala. July 13, 2007) (it makes no sense to impose the burden on a party to prove a negative as an affirmative defense); *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 138 (Tex. App. 2000) (same); *Cornish v. State*, 65 Md. App. 213, 216, 500 A.2d 295, 297 (Md. 1985) (same); *Sawtelle v. Sawtelle*, 34 Me. 228, 230 (Me. 1852) (same). Here, your Bureau is making the allegations and also determining the culpability of the School District all in one step. This is certainly not the makings of a fair process or a fair determination, and raises the question of potential bias in openly supporting the position of a contractor in its litigation against a political subdivision of the State.

There was no discussion in your letter or any attempt to apply the applicable standard that the Bureau is required to apply in its reviewing of the actions of the Board of Education under the OMA in calling and conducting the May 16th meeting of substantial compliance with OMA. *See Parkview Cmty. Ditch Ass'n v. Peper*, 2014-NMCA-049, ¶ 13, 323 P.3d 939, 943 (N.M. Ct. App. 2014). "Under the substantial compliance standard, when the OMA has been sufficiently followed so as to carry out the intent for which it was adopted and serve the purpose of the statute, no violation has occurred." *Id.*, quoting *Gutierrez v. City of Albuquerque*, 1981-NMSC-061, ¶ 14, 631 P.2d 304, 307, 96 N.M. 398, 401 (N.M. 1981). "The purpose of the OMA is to provide that governing bodies be required to make decisions in the open where the interested public can observe the action." *Peper*, 2014-NMCA-049 at ¶ 13, 323 P.3d at 943 (citing cases). The OMA should be construed broadly to effectuate its purposes, and courts should avoid narrow definitions that

**EXHIBIT D**



Letter to Blaine N. Moffatt
June 30, 2025
Page 3 of 9

would defeat the intent of the Legislature. *See New Mexico State Inv. Council v. Weinstein*, 2016-NMCA-069, ¶ 73, 382 P.3d 923, 942 (N.M. Ct. App. 2016) (OMA identical to IPRA standard). Here, there are no allegations from your Bureau or from the complainant corporation that any action was ever taken by the Board of Education in executive session or outside of a duly called and open meeting of the Board, and all actions of the Board of Education were listed on its agendas and observable by the public both in-person and virtually. *See* Attorney General's *Open Meetings Act Compliance Guide*, p. 17 (N.M.A.G. 8th ed. 2015); *see also* N.M. Atty. Gen. OMA Determination, *Open Meetings Act Complaint – Doña Ana County Board of Commissioners* (June 20, 2019). Thus, where all the actions taken by the Board of Education could be observed by the public, the Board of Education is in substantial compliance with the OMA. *See id*.

It is clear that the Court of Appeals in *Bd. of Cty. Comm'rs, Luna Cty. v. Ogden*, 1994-NMCA-010, 117 N.M. 181 870 P.2d 143 (N.M. Ct. App. 1994) has already determined the standard for the application of the OMA when it held that "[o]ur central concern is to construe the statute so as to determine and give effect to the legislature's intent." *Ogden*, 1994-NMCA-010, ¶ 14, 117 N.M. at 184, 870 P.2d at 146, *citing State ex rel. Klineline v. Blackhurst*, 1988-NMSC-015, ¶ 12, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (N.M. 1988). "In enacting the Open Meetings Act, the legislature did not intend to impair or impede the effective workings of the various political subdivisions of the state." *Id*., *citing Gutierrez v. City of Albuquerque*, 1981-NMSC-061, ¶ 12, 96 N.M. 398, 401, 631 P.2d 304, 307 (N.M. 1981) ("These provisions make clear that the Legislature did not intend to unduly burden the appropriate exercise of governmental decision-making and ability to act."). "'To rule otherwise would improperly elevate form over substance' and wreak havoc on a process already fraught with complexity." *Weinstein*, 2016-NMCA-069, ¶ 86, 382 P.3d 923, 946, *quoting Kleinberg v. Bd. of Educ. of Albuquerque Pub. Sch.*, 1988-NMCA-014, ¶ 31, 107 N.M. 38, 44, 751 P.2d 722, 728 (N.M. Ct. App. 1988). As such, it begs the question of why your Bureau made legal determinations with regard to unilaterally seeking to void actions of the Board of Education affecting ongoing litigation that the Bureau is not even involved in to presumably favor the alleged complainant and having not afforded the Board of Education an opportunity to be heard.

Moreover, without further investigation into the truth or falsity of the allegations, the complainant's allegations appear to have been simply accepted at face value, at least to the Bureau's main concern. There simply is no evidence of anyone at your Bureau who had tested the purported facts with regard to the requirements of the contract termination terms between Stride/K12, Inc. and of the material breaches perpetrated by the contractor described in the Meeting of May 16th or any of the legal implications of the allegations attempting to thwart the Board of Education from acting in the best interests of students and to prepare for the upcoming school year with a new contractor. *See* Video of May 16th Meeting of the Board of Education to Terminate Contract https://www.youtube.com/watch?v=VHKdzqqN_SM; *see also* Public Information on Termination of Contract at https://www.gmcs.org/page/stride-inc.

**EXHIBIT D**

Letter to Blaine N. Moffatt
June 30, 2025
Page 4 of 9



      Unfortunately, the Bureau's actions in appearing to be coordinating with a third party, or, if not doing so, self-effectuating an OMA complaint so it can "investigate" and immediately make legal determinations without notice or an opportunity to be heard by the governmental entity subject to the OMA is in complete disregard of its duty and responsibilities to fairly and objectively investigate the allegations and enforce the OMA.  *See Stainback v. Mabus*, 671 F. Supp. 2d 126, 138 (D.D.C. 2009) ("a fair and impartial process is essential to the due process rights" of the parties); *see also In re Murchison,* 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.").  Moreover, your letter has found its way to the media, which raises even more questions as to the bias of your Bureau since the letter was only addressed to this law firm and the School District Board President with carbon copies to the remaining School District Board Members.  We can affirm that none of the addressees of your letter released it to the media.  If there was request for public records at your Bureau, the issue remains as to how anyone knew about your letter to request it.  As such, **this letter is also a request to inspect public records at NMDOJ pursuant to the New Mexico Inspection of Public Records Act ("IPRA"), N.M. Stat. Ann. § 14-2-1** *et. seq.* **(2023) as follows:**

1. **Produce for inspection any and all e-mails, letters, texts, on-line forms or any other forms communications internally within the Department and between Stride/K12 Inc., its employees and representatives, and the law firm of Rodey, Dickason, Sloan, Akin & Robb, P.A. and the New Mexico Department of Justice, including all of its employees and representatives, related to or pertaining to the Gallup-McKinley County Schools, the Board of Education for the Gallup-McKinley County Schools and Mike Hyatt from the March 1, 2025 to the present;**
2. **Produce for inspection any and all public records relating to complaints, demands, referrals or reports received by the NMDOJ pertaining to the Gallup-McKinley County Schools, the Board of Education for the Gallup-McKinley County Schools and Mike Hyatt from the March 1, 2025 to the present.  This includes, but is not limited to, investigative reports, referrals, evaluations, memoranda, internal forms and investigative materials and attachments;**
3. **Produce for inspection any and all IPRA requests received by the Department from June 17, 2025 to the present, including all e-mails, letters, memoranda, texts, on-line forms or any other forms communications internally within the Department regarding your letter of June 17, 2025; and**
4. **Produce for inspection any and all communications of any type or form with any member of the media, public advocacy group or individuals related or pertaining to your letter of June 17, 2025 or the Gallup-McKinley County Schools, the Board of Education for the Gallup-McKinley County Schools and Mike Hyatt.**

**The School District will pay any and all reasonable fees for production of the public records electronically to my e-mail address provided hereto.**

**EXHIBIT D**



Letter to Blaine N. Moffatt
June 30, 2025
Page 5 of 9

      As background and as an example of the factual issues surrounding the Board meeting on May 16th where your letter is silent, the Superintendent of Schools and his staff discovered in late February and early March of 2025 that Stride/K12 Inc. failed to check with the past employers for their staff employees to ensure those adults did not have past sexual misconduct with minors as required by Section 22-10A-5.2 of the School Personnel Act that requires all applicants for licensure and those who would have unsupervised access to children to have an approved background check on file with the New Mexico Public Education Department prior to having unsupervised access to students. Per State legislation contained in House Bill 128, a HB128 form must also be completed for anyone that will have unsupervised access to students, and that was not the case for any employees of Stride/K12 Inc. The Superintendent further discovered that Stride/K12 Inc. CEO James Rue admitted that his company purposefully did not follow the law by creating inordinately large class sizes and teacher loads in order to lower his company's overhead costs and maximize profits. This strategy harmed students and did not allow for the student to have the quality of instruction they deserved. *See* https://www.gmcs.org/page/stride-inc (which includes a Q&A of most asked questions).

      Millions of public dollars were likely defrauded by Stride/K12 Inc. by not hiring the appropriate numbers of teachers, including for special education students as required under the provisions of N.M. Stat. Ann. § 22-8-21 (1997) and N.M. Stat. Ann. § 22-10A-20 (2003) and the Board of Education's Policy I-4550/IIB and hiding it from the School District, which appears to be of lesser concern to the Department. This was a material breach of the Contract in exceeding the allowable thresholds of Stride/K12 Inc.'s teachers to student ratios which, in addition to being contrary to law, is also contrary to Paragraphs 1.2 and 3.5.1 of the Contract. The Superintendent found that Stride/K12 Inc. had 117 separate violations of law with regard to student-to-teacher ratios as of April 1, 2025. It was also revealed that Stride also had only 3 academic counselors overseeing several thousand students, including those attempting to attend college, which also boosted their revenue and profits at the expense of the School District's students. There were also other findings of material breaches, including but not limited to substandard graduation rates, excessive turnover of students, failing to track student absences, and failure to meet statutory requirements for testing of students. Unfortunately, the Superintendent has now become a target of the former vendor in order to distract from the real legal issues of Stride/K12 Inc.'s material breaches of its contract and illegal activities, and it appears that your Bureau has followed its lead.

      With regard to the issue of ratification at the May 16th meeting, which your letter stated was of the most concern to you, Stride/K12 Inc. incorrectly asserted that the Superintendent formally terminated the Contract between the Board and the company on April 1, 2025 under some unidentified authority. However, the Contract itself was not formally terminated until the Board of Education did so on May 16, 2025 at the open meeting as per its agenda following the end of the cure period. This should not have been an issue at all to the Bureau if it had simply inquired what was transpiring under the contract terms leading to the ratification, rather than just relying

**EXHIBIT D**



upon the complainant who clearly wished to continue with the contract at any cost.  *See* Purchase order for K12/Stride, Inc. for FY25 of $30,710,592.16.

To explain further, pursuant to Paragraph 12.1 of the Educational Products and Services Agreement between the Gallup-McKinley County Schools and K12 Virtual Schools LLC, the April 1, 2025 letter was not any form of final action to terminate as asserted by Stride/K12 Inc., rather, the letter was the fulfillment of a contractual requirement to initiate the 45-day cure period under the Contract.  *See* School District Letter of April 1, 2025, to Stride/K12 Inc., attached as <u>Exhibit 1</u>.  The cure period provided under the contract terms allows Stride/K12 Inc. an opportunity to remedy the material breaches of the contract associated with the notice of the breaches contained and provided within the letter to Stride/K12, Inc.  Under the terms of the contract, this cure period must be completed before the contract can be terminated.  It is important to note here that the letter specifically sets forth the School District's expectations and requirements for the remedies of the material breaches to prevent the termination following the cure period.  *See* <u>Exhibit 1</u>.  A more detailed letter was sent to Stride/K12 Inc. on April 22, 2025, addressing the company's request for more specific detail and information of the breaches, and the School District refined and detailed the remedies expected and made demands for more information and student data from the company, which it summarily ignored.  *See* School District Letter of April 22, 2025, to Stride/K12 Inc., attached as <u>Exhibit 2</u>.  Unfortunately, for Stride/K12 Inc., it failed to cure any of the material breaches on or before May 15, 2025, compelling the Board of Education to terminate the Contract in a formal and final action of the governing body at its meeting on May 16, 2025 with a vote at a duly called and open meeting with the action on the agenda.

Under no circumstances can or should the letter of April 1, 2025 be construed as an action requiring a final action or vote by the Board of Education at an open meeting under the OMA, as it was merely a ministerial act associated with the contract terms that could be initiated and completed by the School District's Administration as to the procurement of services and supervision of a contract by a chief procurement officer under the Procurement Code  *See* N.M. Stat. Ann. § 13-1-95.2 (2013) and N.M. Stat. Ann. § 13-1-37 (2013).  The courts have been clear that "[w]e decline to view the [OMA] so as to require an open meeting to perform a perfunctory or purely ministerial act."  *Kleinberg*, 1988-NMCA-014 at ¶ 22, 107 N.M. at 43, 751 P.2d at 727.  The term "final action" should be defined to mean "the final **vote** required to carry out the board's authority on a matter."  *Kanahele v. Maui Cnty. Council*, 130 Haw. 228, 259, 307 P.3d 1174, 1205 (Haw. 2013), *as corrected* (Aug. 30, 2013) (emphasis in original), *citing Kleinberg*, 1988-NMCA-014 at ¶ 22, 107 N.M. at 43, 751 P.2d at 727.  Thus, there was no need for an open meeting and vote of the Board of Education to merely send the contractual requirement notice that triggered the 45-day cure period. Only after the cure period expired need the Board meet at an open meeting to take final action to terminate the contract.  Therefore, the Bureau's analysis in your letter is premised on incorrect and incomplete facts and a misinterpretation of the applicable law.

**EXHIBIT D**

Letter to Blaine N. Moffatt
June 30, 2025
Page 7 of 9



      Initially, Stride/K12 Inc. asserted that the Superintendent was acting unilaterally without the knowledge and concurrence of the Board of Education for some undefined personal gain (a frivolous claim). That claim caused the Board of Education to include a ratification of the April 1, 2025 letter at its meeting on May 16th to ensure to all, including the public and to Stride/K12 Inc. that any and all decisions regarding the performance of the contract and the ultimate decision on termination of the Contract would be that of the Board of Education alone. As the courts have clearly stated, "[r]atification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent." *Bd. of Cnty. Comm'rs of Cnty. of Bernalillo v. Chavez*, 2008-NMCA-028, ¶ 15, 143 N.M. 543, 547, 178 P.3d 828, 832 (N.M. Ct. App. 2008), *quoting Johnson & Johnson v. Tax'n & Revenue Dep't of State of N.M.*, 1997-NMCA-030, ¶ 16, 123 N.M. 190, 194, 936 P.2d 872, 876 (N.M. Ct. App. 1997). While maintaining that the April 1, 2025 letter was authorized and legal in all regards, the Board of Education took the additional step to ratify the letter as its own for the purpose of rendering Stride/K12 Inc.'s argument against the Superintendent moot. *See La Mesa Racetrack & Casino v. State Gaming Control Bd.*, 2012-NMCA-076, ¶ 24, 283 P.3d 886, 89 (N.M. Ct. App. 2012) ("Moreover, the issue pertaining to the authority of the director to send the letter to La Mesa has been rendered moot. It is undisputed that after the director sent La Mesa the letter, the Board approved and ratified the director's action . . . ."); *see also Chavez*, 2008-NMCA-028, ¶¶ 1, 21-22, 143 N.M. at 543 and 549, 547, 178 P.3d at 828 and 834 (concluding that summary judgment was properly granted on a claim alleging that the mayor took unauthorized unilateral action because it was undisputed that the city council subsequently ratified the mayor's action).

      This action to ratify ensured that a public record of the vote was created. The Board members, in full public view, had to vote on their position concerning the sufficiency of notice and the opportunity for the contractor to remedy the breaches of the contract during the cure period, as required under the contract terms. While the Board's ratification is effective on May 16th, having been acted upon at that particular duly called and open meeting announced on the agenda (*see Weinstein*, 2016-NMCA-069 at ¶ 88, 382 P.3d at 946), the letter is otherwise and remains effective as notice under the contract terms, as a matter of law, on April 1, 2025. *See Kleinberg*, 1988-NMCA-014 at ¶ 30, 107 N.M. at 44, 751 P.2d at 728. However, the Bureau's letter now proclaims that the ratification action is void and that, because of the ratification action, the subsequent termination of the Contract was also void without ever addressing and applying the above-referenced law and facts. The Bureau's letter now gives Stride/K12 Inc. yet another suspect reason to challenge the actions of the Board acting clearly within its purview and authority. The Bureau's letter will now logically increase the costs to the School District of the ongoing litigation to now have to address the references to the Bureau's ill-conceived, unsupported and unilateral determination letter. Therefore and simply put, the Board's vote to ratify the notice letter of April 1, 2025 and then to formally take final action to terminate the contract with Stride/K12 Inc. at the May 16th meeting was lawful, consistent with applicable contract law and the terms of the Contract and was in taken substantial compliance with the OMA.

**EXHIBIT D**

Letter to Blaine N. Moffatt
June 30, 2025
Page 8 of 9



In your letter, you assert that the ability of the public to watch the meeting of the Board of Education was otherwise limited or denied on May 16th and then assert that there are no instructions on how to virtually attend the meetings of the Board. Unfortunately, your Bureau has again relied upon misinformation to make its determinations. First, the screenshot you provided in your letter as proof of limited or denied on-line access to the meeting was actually a temporary disruption of the broadcast of the meeting when profanity was being used by members of the public. More importantly, if you had watched the video of the meeting in its entirety, you would have seen that the Board had recessed the meeting at the time when some members of the public in attendance began to disrupt the meeting. The video further shows that only two members of the Board were present on the dais at the time the broadcast was interrupted, and they were, at that time, being inundated with profanity-laden comments from some members of the public which were audible on YouTube™, and which violate the School District's license to broadcast the meeting on YouTube™. Thus, the public is, in fact, entitled to attend and listen to the Board conduct its business (*see* N.M. Stat. Ann. § 10-15-1(A) (2013)), but at the time of the disruption of the broadcast, there was no business being transacted by the Board as the meeting was not in session. The broadcast on YouTube™ resumed upon the Board returning from recess to complete its agenda in open session.

Lastly, the "Watch it here" button or link pertaining to the meeting on the School District's website is there for the public to watch the Board meeting and does not need any instructions. A click on the link redirects the user's web browser to the YouTube™ channel/page where the meeting is broadcast by the School District to that URL on YouTube™. There is literally nothing for anyone who wants to view the meeting to do other than click/tap the button/link to immediately access the meeting. Thus, there has been no violation of the OMA, in fact or in theory, and the concerns of the Bureau are unwarranted and unsupported.

Your Letter also raises the Bureau's concern regarding public comment at the Board's meeting despite the fact that there was no public comment on the agenda at the May 16th Meeting. The procedure utilized by the School District is that any member of the public can submit a public comment form electronically or in-person. *See* Board Policy B-2150/BRDH at subparagraph (f) located at https://go.boarddocs.com/nm/gmcs/Board.nsf/goto?open&id=BTVRDU6D8B4D. Once received by the School District, the individual is sent an individual link to participate in and observe and listen to the meeting outside of the YouTube™ streaming so that he or she can be seen and heard at the meeting for the purpose of providing public comment. Your contention that the OMA requires that all virtual attendees of the meeting must be provided with immediate means of virtual access to the meeting to speak is contrary to law. There is no reason why a virtual attendee of a Board meeting can or should be able to participate in the meeting electronically while the individual's in-person counterpart cannot speak without submitting a public comment form. This would violate equal protection under both the U.S. and New Mexico Constitutions. Moreover, since public comment is not required under the OMA, reasonable limitations on time and place for public comment is allowed under law, including the use of a public comment form. The School

**EXHIBIT D**

Letter to Blaine N. Moffatt
June 30, 2025
Page 9 of 9



District has established a limited public forum in which public comment can only be taken on matters on the agenda. *See* Board Policy B-2150/BRDH, as such, a public comment form facilitates the limited public forum.

    There are two items in which the Bureau is on point that the School District must improve upon in its compliance with the OMA. However, these issues are relatively minor and remain in substantial compliance with the OMA. 1) The Notice of Meeting should contain the access language from the Board's annual OMA resolution since the Board purports to follow those provisions as well as the OMA, and 2) that the Board did deviate from its normal practice of reading the agenda item upon entering the executive session, justifying its entry into executive session at the May 16th meeting. However, the agenda was specific as to the topic and justification for the executive session and was published 72 hours prior to the meeting. These two notes had no effect on the progress of the meeting nor deprived the public of observing and hearing the meeting as the Board conducted its business on May 16th.

    If you have any questions, please feel free to call or e-mail me. Thank you.

Sincerely,

ANDREW M. SANCHEZ

cc:    Board of Education
        Superintendent of Schools

**EXHIBIT D**



**GALLUP-McKINLEY COUNTY SCHOOLS**

EMPOWERING OUR FUTURE

**Mike Hyatt, Superintendent**
mhyatt@gmcs.org

**Deputy Superintendent**
Jvanna Hanks II
**Assistant Superintendent**
Wade Bell
K'Dawn Montano

April 1, 2025

**VIA ELECTRONIC MAIL
AND BY U.S. MAIL**

**kchavous@k12.com**
K12 Virtual Schools LLC
℅ Kevin P. Chavous
President of Academics, Policy and Schools
2300 Corporate Park Drive, Suite 200
Herndon, Virginia 20171

Re:    **TERMINATION FOR CAUSE AND NOTICE OF NONRENEWAL**

Dear Mr. Chavous,

      Pursuant to Paragraph 12.1 of the Educational Products and Services Agreement between the Gallup-McKinley County Schools and K12 Virtual Schools LLC ("Agreement"), the Board of Education for the Gallup-McKinley Schools is terminating the Agreement for cause. The material breaches of the terms of the Agreement are as follows:

1. K12 knew or should have known it was violating the applicable law and local policy in exceeding the required teacher-student ratio under N.M. Stat. Ann. § 22-10A-20 (2003) and the Board of Education's Policy I-4550/IIB on the same in approximately 117 instances of exceeding allowable thresholds of K12's teachers contrary to Paragraphs 1.2 and 3.5.1 of the Agreement;
2. K12 knew or should have known it was violating the applicable law and local policy in not having appropriately licensed teachers under N.M. Stat. Ann. § 22-10A-6 through § 22-10A-6 (2003) and the Board of Education's Policy G-3550 GCGC as there were 47 instances in which appropriate licensure was not documented or did not algin with the assigned role of K12's teachers contrary to Paragraphs 1.2 and 3.5.1 of the Agreement;
3. The lack of sufficient staffing has resulted in the reduction of academic progress for students and of student services done intentionally by K12 to increase K12's profits and lower its costs contrary to Paragraphs 1.2; 3.5.1; 3.5.6; and 9.2 of the Agreement;
4. K12 knew or should have known it was violating the applicable law and local policy in exceeding the required teacher-student ratio under N.M. Stat. Ann. § 22-8-21 (1997)

640 S. BOARDMAN, GALLUP, NM 87301   |   505-721-1000   |   GMCS.ORG



EXHIBIT 1

and N.M. Stat. Ann. § 22-10A-20 (2003) and Board of Education's Policy I-4550/IIB on the same for approximately 117 instances of exceeding allowable thresholds of K12's teachers contrary to Paragraphs 1.2; 3.5.1 and 3.5.6 of the Agreement;

5. The lack of sufficient staffing has resulted in the reduction of academic progress for students in the program done intentionally by K12 to increase K12's profits and lower its costs contrary to Paragraphs 1.2; 3.5.1; 3.5.6; and 9.2 of the Agreement;
6. K12's unlawful reductions in staffing has adversely effected the graduation rate for the Destinations Career Academy in potential violation of N.M. Stat. Ann. § 22-13-1.1 (2024) and demonstrating the adverse effect of K12's profiteering in reducing staff;
7. K12 issued Hotspots that K12 knew or should have known would not work in the areas serviced by K12 in violation of Exhibit A of the Agreement on the required Curriculum and Services contrary to Paragraphs 1.2; 3.5.1; 3.5.6; and 9.2 of the Agreement;
8. K12 failed to achieve standardized testing rate of 95% as required by the Public Education Department and the applicable law contrary to Paragraphs 1.2; 3.5.1; 3.5.6; and 9.2 of the Agreement; and
9. K12 failed to timely conduct standardized testing and failed to submit accurate reporting of testing contrary to Paragraphs 1.2; 3.5.1; 3.5.6; and 9.2 of the Agreement.

The appropriate remedy pursuant to Paragraph 12.1 for compliance with the Agreement is the immediate staffing by K12 to comply with law and policy and for students who have been adversely effected by K12's staffing shortages, K12 must provide at its own costs compensatory academic services to students subject to K12's illegal teacher-student ratio classes. The School District shall determine the specific services and the extent of these compensatory services to be provided for students K through current seniors outside of their current requirements for instruction during the school day. For those former students who have graduated or failed to graduate, K12 shall provide at its expense compensatory services, including vocational services and precollege services to assist these individuals used for K12's profiteering.

The termination of the Agreement is effective on June 30. 2025. In addition, pursuant to Paragraph 7.2, this letter gives Notice by the Board of Education that the Agreement will not be renewed.

Mike Hyatt

**EXHIBIT D**



**Mike Hyatt, Superintendent**
mhyatt@gmcs.org

**Deputy Superintendent**
Jvanna Hanks II
**Assistant Superintendent**
Wade Bell
K'Dawn Montano

April 22, 2025

**VIA ELECTRONIC MAIL**
**AND BY U.S. MAIL**

**ahawf@k12.com**
K12 Virtual Schools LLC
℅ Adam C. Hawf
Senior Vice President, Schools
2300 Corporate Park Drive, Suite 200
Herndon, Virginia 20171

    Re:    **DATA IN SUPPORT OF TERMINATION FOR CAUSE**

Dear Mr. Hawf,

    In response to your letter dated April 8, 2025, in which Stride feigns being unable to identify the numerous material breaches of the Agreement to which it knew or should have known. The following are additional facts for your clarification, but the material breaches are not limited to the following and all details are not included in the need for brevity to address the termination of the Agreement.

1. In reviewing percentage point comparisons, the School Day Participation Rate for K12 for the Spring 2023 was 17.4 percentage points lower than the students engaged in in-person instruction. The deficit in ELA students in K12 is 17 percentage points for ELA students; the Math and Science Participation Rates are 18.4 percentage points lower than for in-person students and standardized testing participation rates are 43.6 percentage points lower for Englich Language Arts and Mathematics and 50 percentage points lower for Science compared to in-person students;

2. The numbers for Spring 2024 are still well below the required 95% participation mandated by State law and the PED despite e-mails to K12 regarding the need to meet testing requirements. There are multiple e-mail chains dated April 2, 2022; May 19, 2022; August 28, 2023; May 6, 2024, and May 9, 2024, in which the School District gave notice to K12 of its testing deficits and failure to comply with State law,

**EXHIBIT**
**2**
EXHIBIT D

regulations and Board of Education Policies. The School District has determined that K12's current testing rate for this school year as of April 14, 2025 is only 37%;

3. On December 17, 2024, and on December 24, 2024, K12 submitted withdrawal reports for students who have been inactive for extended periods of the school year, including one student who is listed as withdrawn from K12 on September 3, 2024, but who was not included in a withdrawal report from K12 until December 24, 2024. There are 21 students who were withdrawn from K12 long before being included in a withdrawal report submitted to the School District. K12's withdrawal criteria, as seen in the **Next Placement** column of the attached table, include **Absences for 10 consecutive days** and **Student Never Started with K12 constituting ghost students to the enrollment at K12.** The School District was not made aware of student withdrawal dates until the students appeared on the reports that were submitted by K12 often long after these students should have been removed from the enrollment rolls. This delay results in non-compliant inclusion of these students in the 80 Day reporting window and, for one student, in the 40-Day reporting window starting 10/9/2024. Despite previous multi-year efforts to work with K12 on improving timeliness of withdrawing students, and letting us know about it, these issues continue to persist.

| STRIDE STUDENT ID | GRADE | WITHDRAW DATE | EXIT CODE | NEXT PLACEMENT |
|---|---|---|---|---|
| 5488396 | 12th Grade | 11/21/2024 | W2 | Absent for 10 consecutive days |
| 6033255 | 9th Grade | 11/18/2024 | W1 | Tohatchi High School |
| 6051393 | 11th Grade | 10/30/2024 | W1 | Student Never Started with K12 |
| 5986146 | 9th Grade | 11/21/2024 |  | Not Provided |
| 6042734 | 11th Grade | 10/13/2024 | W2 | Absent for 10 consecutive days |
| 5010468 | 10th Grade | 11/20/2024 | W2 | Absent for 10 consecutive days |
| 5959931 | 11th Grade | 11/1/2024 | W1 | Student Never Started with K12 |
| 6068214 | 11th Grade | 11/16/2024 | W2 | Absent for 10 consecutive days |
| 6072819 | 12th Grade | 11/21/2024 | W1 | Student Never Started with K12 |
| 5003505 | 7th Grade | 11/18/2024 | W2 | Absent for 10 consecutive days |
| 6062452 | 2nd Grade | 12/2/2024 |  | Not Provided |

**EXHIBIT D**

| 2088897 | 7th Grade | 11/14/2024 | W2 | Absent for 10 consecutive days |
| 6087146 | 10th Grade | 10/26/2024 | W4 | CNM GED Program |
| 5795829 | 11th Grade | 10/10/2024 | W2 | Absent for 10 consecutive days |
| 4572599 | 9th Grade | 10/28/2024 | W2 | Absent for 10 consecutive days |
| 6035778 | 11th Grade | 11/8/2024 | W1 | Las Montanas Charter High School |
| 5968888 | 11th Grade | 11/8/2024 | W2 | Absent for 10 consecutive days |
| 5955139 | 7th Grade | 11/26/2024 | W10 | Moved out of state |
| 6003519 | 11th Grade | 9/3/2024 | W1 | Student Never Started with K12 |
| 6023708 | 5th Grade | 12/2/2024 | W2 | Absent for 10 consecutive days |
| 6098256 | 10th Grade | 11/21/2024 | W4 | CNM GED Program |

4. K12 has failed to consistently provide timely updates regarding student withdrawals, new enrollments, scheduling information, or required documentation such as guardianship papers and age verification forms. These delays adversely affect the School District's ability to meet State reporting requirements and disrupts established workflows, as the School District relies on K12 reporting for its reporting to the PED.

5. The graduation rate as calculated for K12 clearly demonstrates deficiency in the following areas: program of instruction, resources provided, student and parent communication, teachers, counselors, computers and access, etc…that is also lacking in substance and supervision leading to a horrific graduation rate for this last school year that is anticipated to be matched this school year as follows -

   a. 2024    27.67%
   b. 2023    54.29%
   c. 2022    55.79%
   d. 2021    47.88%

   K12 has been repeatedly notified that the graduation rate for K12 had to improve.

6. To increase profits by reducing staff levels and employing specialized staff, K12 has failed to appropriately identify students for special education services. The result is significant harm to the School District to identify and address student need for services at level 3 and level 4 as required by Federal and State law. More importantly, as of the 120th day reporting, K12 has 11 teachers over their permitted case load for SPED students.

**EXHIBIT D**

K12 for the current school year had 40 annual IEPs that were late and has 44 late IQ Evaluations. An audit of all IEPs associated with K12 will be conducted immediately. During the 2023-2024 school year the School District's SPED Director told K12/Stride to ensure DCA was doing IEP meetings for transfer students within 30 days of enrollment. While K12 indicated it would do so utilizing the School District's process, it failed to do so. As a result, students were not getting appropriate services, and some students were taking the wrong State test this Spring (2025) and potentially the incorrect curriculum. Additionally, the School District is again not getting timely notification of changes in services for students which also causes inappropriate testing issues.

This failure is contrary to law to which K12 knew or should have known. In one instance, a student with a significant exceptionality is unable to participate in on-line instruction yet K12 kept the student enrolled when the appropriate services for the student was in-person homebound services. K12's actions in this matter are reprehensible and clearly contrary to the student in the name profiteering.

|      | **Level 1** | **Level 2** | **Level 3** | **Level 4** |
|------|-------------|-------------|-------------|-------------|
| **K12**  | 52.23% | 43.30% | 2.4% | 2.1% |
| **GMCS** | 31.71% | 47.94% | 6.8% | 13.5% |

7. There are 66 teachers exclusively employed by K12 that are not sufficiently licensed to teach at DCA and are listed in the attached Excel Sheet. The duty of providing qualified teachers is solely on K12;

8. The proficiency rates of K12 are substantively substandard for any substantive program of instruction and K12 numbers have been declining each school year as follows –

   a. **Math Proficiency** – For the 2022-2023 school year K12 is 12.9 percentage points lower than in-person students and 17.6 percentage points lower than the State proficiency rate, and for the 2023-2024 school year K12 is 12.4 percentage points lower than in-person students and 17.5 percentage points lower than the State proficiency rate, demonstrating no progress by K12;
   b. **Reading Proficiency** – For the 2022-2023 school year K12 is 1.2 percentage points lower than in-person students and 11 percentage points lower than the State proficiency rate, and for the 2023-2024 school year K12 is 7.4 percentage points lower than in-person students and 16.3 percentage points lower than the State proficiency rate, demonstrating no progress by K12; and
   c. **Science Proficiency** – For the 2022-2023 school year K12 is 10.8 percentage points lower than in-person students and 17.7 percentage points lower than the State proficiency rate, and for the 2023-2024 school year K12 is 11.3 percentage points lower than in-person students and 20.1 percentage points lower than the State proficiency rate, demonstrating no progress by K12

**EXHIBIT D**

    d. K12 failed to develop any remediation plan or sought School District input from for substandard proficiency by students at DCA following more than two consecutive years of bad performance contract to Paragraph 3.4.6 of the Agreement;

9. K12 teachers have only completed 83.2% of all required occupational and professional trainings under State law;

10. K12 has suffered at least one data breach during the term of the Agreement and failed to appropriately notify the New Mexico Department of Justice or Gallup McKinley County schools as required by the Data Breach Notification Act NMSA (2017) Chapter 57 Article 12C;

11. K12 knew or should have known it was violating the applicable law and local policy in exceeding the required teacher-student ratio under N.M. Stat. Ann. § 22-10A-20 (2003) and the Board of Education's Policy I-4550/IIB in exceeding the allowable thresholds of K12's teachers contrary to Paragraphs 1.2 and 3.5.1 of the Agreement as follows –

Section 22-10A-20(A) -

| | | |
|---|---|---|
| 1. | Duran, Libby | 25 |
| 2. | Finlay, Magnolia | 23 |
| 3. | Gibbons, Cherrea | 23 |
| 4. | Hatley, Klanese | 24 |
| 5. | Hunter, Joanna | 22 |
| 6. | Jumper, Ashley | 22 |
| 7. | Madoni, Brenda | 24 |

Section 22-10A-20(B) –

| | | |
|---|---|---|
| 1. | Grades 1-3 Average | 23.04 |

Section 22-10A-20(C) –

| | | |
|---|---|---|
| 1. | Grades 4-5 Average | 33.00 |

Section 22-10A-20(D) –

| | | |
|---|---|---|
| 1. | Angell, Ryan | 226 |
| 2. | Bartley, Elizabeth | 188 |
| 3. | Benson, Nathaniel | 174 |
| 4. | Britt, Julie | 207 |
| 5. | Canary, Robert | 225 |
| 6. | Coleman, Jessica | 205 |
| 7. | Cook, Chas | 189 |
| 8. | Davis, Tanya | 178 |

**EXHIBIT D**

| | | |
|---|---|---|
| 9. | Dukes, Lance | 224 |
| 10. | Felder, Jessica | 220 |
| 11. | Gifford, Bonnie | 167 |
| 12. | Greene-Wall, Mary | 182 |
| 13. | Hohenthaner, Crystal | 185 |
| 14. | Jaramillo, Gabriel | 218 |
| 15. | Kast, Nancy | 174 |
| 16. | Loe, Lacey | 222 |
| 17. | Martinez, Oclides | 164 |
| 18. | Preciado, Megan | 176 |
| 19. | Vaughan, McKenzie | 182 |
| 20. | Cook, Chas - ELA | 189 |
| 21. | Bartly, Elizabeth - ELA | 188 |
| 22. | Britt, Julie - ELA | 207 |
| 23. | Greene-Wall, Mary - ELA | 182 |
| 24. | Hohenthaner, Crystal | 185 |
| 25. | Vaughn, McKenzie | 182 |
| 26. | Bartley, Elizabeth, D-ENG-06BE3-KN-60162-M3 | 40 |
| 27. | Bartley, Elizabeth, D-ENG-06BE3-KN-60162-M4 | 47 |
| 28. | Bartley, Elizabeth, D-ENG-07BE3-KN-60162-M2 | 48 |
| 29. | Bartley, Elizabeth, D-ENG-07BE3-KN-60162-M5 | 53 |
| 30. | Britt, Julie, D-ENG-07BE3-KN-57159-M2 | 51 |
| 31. | Britt, Julie, D-ENG-07BE3-KN-57159-M3 | 56 |
| 32. | Britt, Julie, D-ENG-07BE3-KN-57159-M4 | 53 |
| 33. | Britt, Julie, D-ENG-07BE3-KN-57159-M5 | 47 |
| 34. | Cook, Chas, D-ENG-06BE3-KN-57234-M2 | 51 |
| 35. | Cook, Chas, D-ENG-06BE3-KN-57234-M3 | 44 |
| 36. | Cook, Chas, D-ENG-06BE3-KN-57234-M4 | 48 |
| 37. | Cook, Chas, D-ENG-06BE3-KN-57234-M5 | 46 |
| 38. | Greene-Wall, Mary, D-ENG-07BE3-KN-60739-M3 | 46 |
| 39. | Greene-Wall, Mary, D-ENG-08BE3-KN-60739-M2 | 49 |
| 40. | Greene-Wall, Mary, D-ENG-08BE3-KN-60739-M4 | 43 |
| 41. | Greene-Wall, Mary, D-ENG-08BE3-KN-60739-M5 | 44 |
| 42. | Hohenthaner, Crystal, D-ENG-08BE3-KN-58958-M2 | 46 |
| 43. | Hohenthaner, Crystal, D-ENG-08BE3-KN-58958-M3 | 58 |
| 44. | Hohenthaner, Crystal, D-ENG-08BE3-KN-58958-M4 | 39 |
| 45. | Hohenthaner, Crystal, D-ENG-08BE3-KN-58958-M5 | 42 |
| 46. | Vaughan, McKenzie, D-ENG-08BE3-KN-59587-M2 | 46 |
| 47. | Vaughan, McKenzie, D-ENG-08BE3-KN-59587-M3 | 62 |
| 48. | Vaughan, McKenzie, D-ENG-08BE3-KN-59587-M4 | 33 |
| 49. | Vaughan, McKenzie, D-ENG-08BE3-KN-59587-M5 | 41 |
| 50. | Alfiky, Sophia | 216 |
| 51. | Bhattacharyya, Aunup | 198 |
| 52. | Booth, Lynne | 170 |
| 53. | Border, Julia | 182 |
| 54. | Chiri, Stacy | 175 |

**EXHIBIT D**

| | | |
|---|---|---|
| 55. | Davis, Mark | 193 |
| 56. | Doak, Kaylin | 181 |
| 57. | Giovannini, Sandra | 210 |
| 58. | Holderfield, Tamara | 197 |
| 59. | Johnson, Timothy | 190 |
| 60. | Justice, Leigh | 204 |
| 61. | Kleczka, Jenny | 174 |
| 62. | Knable, Alicia | 169 |
| 63. | Maldonado, Shelley | 162 |
| 64. | Mendoza, Ismael | 184 |
| 65. | Nelson, Caroline | 178 |
| 66. | Powell, Justine | 170 |
| 67. | Ragland, Randall | 177 |
| 68. | Stanzione, Carolyn | 197 |
| 69. | Tomlinson, Rebecca | 202 |
| 70. | Wall, Jonathan | 165 |
| 71. | Whitt, Alice | 163 |
| 72. | Williams, Kaila | 182 |
| 73. | Williams, Sabrina | 209 |
| 74. | Williams, Zachary | 186 |
| 75. | Border, Julia - ELA | 182 |
| 76. | Chiri, Stacy - ELA | 175 |
| 77. | Kleczka, Jenny - ELA | 174 |
| 78. | Knable, Alicia - ELA | 169 |
| 79. | Maldonado, Shelley - ELA | 162 |
| 80. | Powell, Justine - ELA | 170 |
| 81. | Wall, Jonathan - ELA | 165 |
| 82. | Border, Julia, D-ENG-108BE2-KN-57544-HS1 | 38 |
| 83. | Border, Julia, D-ENG-108BE2-KN-57544-HS2 | 39 |
| 84. | Border, Julia, D-ENG-108BE2-KN-57544-HS4 | 41 |
| 85. | Border, Julia, D-ENG-108BE2-KN-57544-HS6 | 64 |
| 86. | Wall, Jonathan, D-ENG-108BE2-KN-60738-HS2 | 38 |
| 87. | Wall, Jonathan, D-ENG-108BE2-KN-60738-HS3 | 33 |
| 88. | Wall, Jonathan, D-ENG-108BE2-KN-60738-HS4 | 41 |
| 89. | Wall, Jonathan, D-ENG-108BE2-KN-60738-HS5 | 53 |
| 90. | Dillard-Mandigo, Joni, D-ENG-208BE2-KN-57593-HS5 | 38 |
| 91. | Dillard-Mandigo, Joni, D-ENG-208BE2-KN-57593-HS6 | 42 |
| 92. | Dillard-Mandigo, Joni, D-ENG-208BE2-KN-57593-HS7 | 49 |
| 93. | Knable, Alicia, D-ENG-208BE2-KN-59039-HS1 | 42 |
| 94. | Knable, Alicia, D-ENG-208BE2-KN-59039-HS3 | 47 |
| 95. | Knable, Alicia, D-ENG-208BE2-KN-59039-HS4 | 45 |
| 96. | Knable, Alicia, D-ENG-208BE2-KN-59039-HS6 | 35 |
| 97. | Powell, Justine, D-ENG-208BE2-KN-62392-HS1 | 38 |
| 98. | Powell, Justine, D-ENG-208BE2-KN-62392-HS2 | 59 |
| 99. | Powell, Justine, D-ENG-208BE2-KN-62392-HS5 | 43 |
| 100. | Chiri, Stacy, D-ENG-303BE3-KN-57782-HS2 | 70 |

**EXHIBIT D**

|     |                                              |     |
| --- | -------------------------------------------- | --- |
| 101. | Chiri, Stacy, D-ENG-303BE3-KN-57782-HS4     | 55  |
| 102. | Kleczka, Jenny, D-ENG-303BE3-KN-61817-HS1   | 63  |
| 103. | Kleczka, Jenny, D-ENG-303BE3-KN-61817-HS7   | 55  |
| 104. | Maldonado, Shelley, D-ENG-403BV2-K-60619-HS1 | 44  |
| 105. | Maldonado, Shelley, D-ENG-403BV2-K-60619-HS2 | 33  |
| 106. | Maldonado, Shelley, D-ENG-403BV2-K-60619-HS3 | 40  |
| 107. | Maldonado, Shelley, D-ENG-403BV2-K-60619-HS6 | 44  |
| 108. | Kleczka, Jenny, D-ENG-403BV2-K-61817-HS5    | 34  |

K12 leadership has been placed on notice as far back as two (2) years that it was not in compliance with the student-to-teacher ratios, and only under termination has K12 made any effort to resolve this particular breach of the Agreement.

12. K12 has counselor-to-student ratios that the School District believes are approximately 1366 students per counselor, depriving students of sufficient services and guidance. The American School Counselor Association recommends a ratio of 250 to one. This lack of services is reflected in your inadequate services to students and deficient reporting compliance. This needs to be remedied.

13. The student turnover rate for FY25 is currently 29.82%. K12 deficiencies in the following areas: program of instruction, resources provided, student and parent communication, teachers, counselors, computers and access, etc.…is leading to an excessive number of students who do not remain with the program.

14. The School District demands the following data from Stride within seven (7) calendar days regarding this requirement of law that K12 knew or should have known –

    a. All keystroke and all other attendance data for all students at DCA for the current school year regarding the amount of instructional time provided by each teacher with written verification of the data provided;
    b. All keystroke and other attendance data for all students at DCA from the 2020-2021 school year to the present; and
    c. All on-line data regarding the amount of time each teacher is face-to-face online providing direct instruction to students excluding all other contacts such as e-mail or portal access without class-wide instruction or tutoring/support.

15. The School District demands all Next Step Plans documentation for Grades 8th through 12th for the 2020-2021 school year to the present within seven (7) calendar days regarding this requirement of law that K12 knew or should have known;

16. The School District demands all technology complaints K12 has received with the date and time stamps of the received complaints and dates when remedied for the 2020-2021 school year to the present within seven (7) calendar days regarding this requirement of Agreement that K12 knew or should have known;

**EXHIBIT D**

17. The School District demands all technology documentation from K12 with student identification numbers denoting when each student received his or her computer and how many days each student waited for said computer or any replacement computer for the 2020-2021 school year to the present within seven (7) calendar days regarding this requirement of Agreement that K12 knew or should have known;

18. The School District demands all documentation K12 reflecting the number of grades entered per week for each student this current school year within seven (7) calendar days regarding this requirement of Board Policy that K12 knew or should have known that two (2) grades per week are required for each student;

19. The School District demands all documentation from 2020-2021 to present regarding or relating to action by K12 to employ teachers and copies of all employment contracts, on-boarding documents on status of licensure and qualifications and documentation regarding such teachers relating to seeking and securing licensure by the PED, completion of the required trainings as set forth by the PED and School District, training on applicable curriculum and instruction and on the policies for DCA within seven (7) calendar days regarding this requirement of Agreement that K12 knew or should have known;

20. The School District demands all documentation regarding or relating to turnover rate for teachers for each school year under the Agreement within seven (7) calendar days regarding this requirement of Agreement that K12 knew or should have known;

21. The School District demands all documentation regarding or relating to the action of K12 on addressing truancy for students absent 10 school days or more within seven (7) calendar days regarding this requirement of Agreement that K12 knew or should have known

22. The School District demands all documentation, including notice and approval regarding or relating to "flex" students who may or may not be subject to asynchronous learning by K12 within seven (7) calendar days regarding this requirement of law that K12 knew or should have known;

It is clear to the School District that additional services and compensatory services need to be provided for students K through current seniors outside of their current requirements for instruction during the school day. As such, the termination of the Agreement remains effective on June 30, 2025.

Mike Hyatt

**EXHIBIT D**